# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| JAMES JOHNSON, | ) |
| Plaintiff, | ) |
| | ) No. 12-cv-05712 |
| v. | ) |
| | ) Judge Andrea R. Wood |
| IMHOTEP CARTER, et al., | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff James Johnson is an inmate at the Stateville Correctional Center ("Stateville"). In March 2012, Johnson was involved in a fight with another inmate when correctional officers approached to break up the fight, maced Johnson, and placed him in handcuffs. Johnson claims that, while he was being placed in the handcuffs, one of the correctional officers broke his finger. He further claims that he was subsequently denied adequate medical treatment for his broken finger and has been experiencing pain and suffering ever since. Accordingly, Johnson has filed this lawsuit pursuant to 42 U.S.C. § 1983, alleging that the defendants violated his constitutional rights by acting with deliberate indifference to his serious medical needs. Although Johnson originally sued several Stateville medical and correctional personnel, only two defendants remain in the case: Dr. Imhotep Carter, who was the Director of the Health Care Unit ("HCU") at the time of the alleged injury, and Darryl Edwards, who was an Assistant Warden at the time.

Now before the Court are Defendants' motions for summary judgment. (Dkt. Nos. 50, 54.) Dr. Carter has also filed a motion to strike two declarations that Johnson submitted in response to the summary judgment motions—one signed by Johnson himself and one signed by his counsel. (Dkt. No. 83.) As discussed below, there is a disputed issue of material fact regarding whether

Johnson exhausted his administrative remedies prior to filing his federal lawsuit. The Court therefore denies Defendants' summary judgment motions without prejudice and will schedule this matter for an evidentiary hearing as provided by the Seventh Circuit's decision in *Pavey v. Conley*, 544 F.3d 739 (7th Cir. 2008) ("Pavey I").

## BACKGROUND

Johnson is an inmate of the Illinois Department of Corrections ("IDOC"), currently housed at the Stateville facility. On March 25, 2012, Johnson was involved in a fight with another inmate. Correctional officers broke up the fight by spraying pepper spray—or "mace"—and handcuffing Johnson. (Pl.'s Stmt. of Additional Material Facts ("PSAF") ¶ 1, Dkt. No. 78.) He claims that as the correctional officers were handcuffing him, one of them bent his finger at an odd angle and broke it. (*Id.* ¶ 2.)

Johnson was taken to the HCU at Stateville, where he was treated by a nurse for the mace in his eyes. (*Id.* ¶ 3.) Johnson claims that he told the nurse that his finger was hurting him a lot and that "he had heard and felt a 'pop'." (*Id.* ¶ 4.) He further states that the nurse observed his swollen finger and told him he would have to wait to receive treatment, as one of the correctional officers needed to be treated first. (*Id.* ¶ 6.) Johnson was then treated for the mace in his eyes but received no treatment for his broken finger before being taken to segregation. (*Id.* ¶ 7.) Johnson states that he was in "extreme pain" because of his broken finger, and that he "had trouble sleeping for extended amounts of time." *(Id.* ¶ 8.) Dr. Carter disputes Johnson's account of his HCU visit on the day of his injury, claiming that medical records from that day show that Johnson did not complain about his finger at that time. (Def. Carter Stmt. of Material Facts ("Carter SOF") ¶ 15(h) & Ex. A, Dkt. No. 53.)

Johnson claims that he told various correctional officers about his finger but no one arranged for him to be visited by a medical technician or called to the hospital. (*Id.* ¶ 11.) According to Johnson, he then asked his cell neighbor to type letters about his broken finger addressed to Sick Call, Dr. Carter, Edwards, and Warden Marcus Hardy. (*Id.* ¶ 12.) Johnson also filed an emergency grievance on March 27, 2012, complaining about his broken finger and requesting treatment. (*Id.* ¶ 13; Dkt. No. 78-3.)

Johnson claims he was called to the HCU in April 2012, but while he was waiting in a segregation holding cell to be seen, he was informed by a medical technician that he was not on the schedule. (PSAF ¶ 14.) Johnson states that he showed the technician his broken finger and she then placed his name on the sick call list. (*Id.* ¶ 15.) He further claims that, while Johnson was waiting to be returned to his cell, he saw Dr. Carter coming out of the HCU. He stopped Dr. Carter and showed him his swollen, broken finger. (*Id.* ¶ 16.) Dr. Carter replied, "OK. It's swollen and bent. What do you want me to do about it?" (*Id.*) Johnson claims that he then told Dr. Carter that he broke his finger after fighting with an inmate, and Dr. Carter refused to treat the injury, stating, "Oh, you fighting with the officers, I can't do nothing for you. You got what you deserve." (*Id.* ¶ 17.)

Johnson next claims that he then saw Assistant Warden Edwards pass by. He showed Edwards the broken finger and asked if he could see a medical technician because he was in a substantial amount of pain. (*Id.* ¶ 18.) Johnson states that he also told Edwards that the nurse who treated him for mace and Dr. Carter both saw his broken finger and denied him medical treatment. (*Id.* ¶¶ 18-19.) According to Johnson, Edwards then said he would go into the HCU to see about medical treatment. Edwards went into the HCU and returned to tell Johnson that he had to go back to his cell. (*Id.* ¶¶ 20-21.) Edwards also told Johnson to drop a sick call request into the sick

3

call box if he needed to be seen. (*Id.* ¶¶ 21-22.) Johnson alleges that he told Edwards there was no sick call box in his unit, and Edwards responded that he did not know what to say and then walked away. (*Id.* ¶¶ 23-24.)

According to Dr. Carter, a note from a Correctional Medical Technician dated April 10, 2012 was the first recorded mention of a subjective complaint from Johnson regarding an injury to his hand and requesting to see a doctor. The note does not mention any swelling of the hand or fingers. (Carter SOF ¶ 15(i) & Ex. A.)

On or around April 20, 2012, Johnson underwent an x-ray that confirmed his finger was broken. (PSAF ¶ 25.) Johnson states that at that time he received a wooden tongue depressor and cloth gauze to wrap his finger. He was also given an over-the-counter painkiller. (*Id.* ¶ 25.) According to Dr. Carter, Johnson was seen by a Physician's Assistant on April 20, 2012, at which point an x-ray was ordered, Johnson was prescribed a painkiller, and the finger was splinted. (Carter SOF ¶ 15(j) & Ex. A.) Dr. Carter claims that Johnson did not show up for his scheduled x-ray on April 24, 2012, and instead the x-ray was performed on April 26, 2012. The x-ray indicated findings of "avulsion fracture base of distal phalanx at insertion of extension tendon." (*Id.* ¶ 15(l)-(m) & Ex. A.) Dr. Carter states that he reviewed the x-ray results on April 30, and directed the Physician's Assistant to tape Johnson's fingers together and repeat the x-ray in ten days' time. (*Id.* ¶ 15(n)-(o) & Ex. A.) A second x-ray was then ordered for May 7, 2012. (*Id.*) The x-ray was actually repeated on May 6, 2014, and showed "undisplaced bone base of distal phalanx 4th finger at insertion of extension tendon." (*Id.* ¶ 15(q) & Ex. A.)

Johnson filed a second emergency grievance on May 1, 2012, stating that he had spoken to "med-techs, nurses, officers, the counselor & I've written countless letters to the sick call and Medical Director Carter in an effort to get seen for my serious medical need." (PSAF ¶ 27; Dkt.

No. 78-4.) Warden Hardy responded to both of Johnson's emergency grievances on May 17, 2012, stating that an emergency was not substantiated and that Johnson should re-submit the grievances according to the normal process. (*Id.* ¶ 29.)

Dr. Carter claims Johnson was seen for a follow-up appointment on May 21, 2012, at which time his x-ray results were discussed and Johnson stated he was "better." (Carter SOF ¶ 15(r) & Ex. A.) Dr. Carter further claims that Johnson was seen for an unrelated basketball ankle injury on September 20, October 5, and October 22, 2012, and did not complain about his finger during any of those appointments. (*Id.* ¶ 15(s) & Ex. A.)

In July 2012, Johnson filed this § 1983 lawsuit *pro se* claiming that the named defendants showed deliberate indifference to his serious medical needs in violation of the Eighth Amendment to the U.S. Constitution.[1] While Johnson was *pro se*, he was deposed by counsel for Dr. Carter and Edwards on August 28, 2013. At the outset of the deposition, counsel for Dr. Edwards stated: "I'll just put on the record that you have just informed us that you never received notice of this deposition; is that correct?" Johnson responded: "Yes, sir." (*Id.* Ex. B at 3:17-21.) Johnson nonetheless agreed to go forward with the deposition.

During the course of his deposition, Johnson testified that he could not remember the specifics of certain events. He stated that when he was first seen in the HCU on the day of the fight, "I had been telling them—when they asked me what was wrong with me, I had been telling them something's wrong with my finger; my finger as well." (*Id.* at 21:10-13.) He further testified that the nurse told him that the officer came first. (*Id.* at 22:22-23.) Johnson testified that once he was placed back in segregation, he "spoke to a couple of officers back there" and "tried to stop a couple of med techs and inform them of the situation" with his finger. (*Id.* at 25:12-15.)

---

[1] Johnson initially named Wexford Health Sources, a Jane Doe Nurse, and Marcus Hardy as Defendants; those Defendants were previously dismissed by the Court. Johnson also voluntarily dismissed Defendant Holly Logan, who had been added in the First Amended Complaint.

In the deposition, Johnson could not remember exactly when in April he was taken back to the HCU. (*Id.* at 27:9-11.) He also could not remember if the first x-ray took place on April 20. (*Id.* at 28:3-4.) But he did recall going to the HCU before he had his x-ray, seeing Dr. Carter there, and telling him about his hand. (*Id.* at 28:21.) Johnson also thought he saw Edwards "one time, then I seen [sic] Carter another time…if that was the same day, I'm not for [sic] sure." (*Id.* at 29:4-8.) He could not recall exactly when he saw Warden Edwards, but he thought that Edwards was initially going to get him medical treatment, and then he "flipped the script" and "we had a little disagreement and, you know, words were exchanged, but I just can't remember exactly." (*Id.* at 31:16-32:12.)

When asked if he appealed his grievances, Johnson testified, "I think so" and "I'm not sure." (*Id.* at 36:21-24.) Johnson also stated that he was unable to use his finger for one and a half to two months after the injury, and that it still bothers him today if he tries to write with it or if he washes his hand. (*Id.* at 39:17-40:11.) He did not recall any response from Edwards to the letters that he wrote. (*Id.* at 45:5.) He could not remember if he spoke to Dr. Carter before or after his x-ray; nor could he remember the details of his conversation with Dr. Carter, stating that "I know it wasn't a pleasant conversation . . . . You know, I was kind of upset." (*Id.* at 48:13-18.) Johnson admitted that Dr. Carter never saw him for treatment, and that instead Johnson saw either a med tech or a nurse when he was in the HCU. (*Id.* at 53:21.)

After Defendants filed their motions for summary judgment, Johnson filed a renewed request to be provided with pro bono attorney assistance. The Court granted Johnson's request. Johnson's newly-assigned counsel then filed a first amended complaint along with Johnson's responses to the motions for summary judgment. Johnson's responses included two sworn declarations: one from Johnson and one from Johnson's counsel. The declaration from Johnson's

counsel describes the appearance of Johnson's finger. (Decl. of Patrick G. Burns Ex. 6, Dkt. No. 78.) The Court has no reason to believe that Johnson's attorney is a physician or that he has other medical expertise (nothing in the declaration indicates that to be the case), and thus his observations are those of a layperson.

Johnson's own declaration describes his version of the events underlying his complaint and further addresses the matter of his participation in IDOC's grievance process. Johnson states that he appealed both of his grievances to the Illinois Department of Corrections Administrative Review Board ("Review Board") and that the Review Board received the appeals on May 21, 2012. (Pl.'s Decl., Dkt. No. 78-1.) Attached to the declaration is the response that Johnson received from the Review Board asking him to provide a copy of his grievance, including any counselor's response, and to provide a report, including the Grievance Officer's and Chief Administrative Officer's response to the appeal. (Pl. Resp., Dkt. No. 78-5.) Johnson does not state, and the record does not otherwise reflect, whether he provided the requested information to the Review Board.

## DISCUSSION

Dr. Carter asserts three arguments in support of his summary judgment motion. First, he argues that Johnson has not exhausted his administrative remedies as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997(e)(a). Second, he contends that Johnson's allegations do not support a claim for deliberate indifference against him. And third, he maintains that Johnson has not shown that any supposed indifference caused him to suffer injuries. For his part, Edwards, an assistant warden, argues that he cannot be found to have acted with deliberate indifference because Johnson was under the care of medical experts at the time Edwards was allegedly notified of the injury. Because there is a disputed issue of material fact regarding

whether Johnson has exhausted his administrative remedies, the Court's does not reach the parties' arguments regarding the merits of Johnson's claims.

**I.      Summary Judgment Standard**

Summary judgment must be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). When presented with a summary judgment motion, "[t]he Court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (quoting *Walbridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994)). In deciding the motion, the Court examines the record in the light most favorable to the non-moving party, resolving all evidentiary conflicts in his favor and according him the benefit of all reasonable inferences that may be drawn from the record. *Coleman v. Donahoe,* 667 F.3d 835, 842 (7th Cir. 2012).

**II.     Motion to Strike Johnson's Declaration**

As an initial matter, the Court must determine what weight, if any, to afford the declarations submitted by Johnson along with his response brief. Dr. Carter has moved to strike these materials. It should be noted that, in the context of motions for summary judgment, "motions to strike … are disfavored and generally unnecessary—the Court is obligated to police the directives of LR 56.1, even in the absence of a motion to strike, and the parties are free to present arguments concerning the inadequacy of the evidence in their briefing." *Hartford Fire Ins. Co. v. Henry Bros. Constr. Mgmt.*, No. 10-cv-4746, 2014 WL 4269057, at *1 (N.D. Ill. Aug. 28, 2014). However, "where motions to strike remove unnecessary clutter from a case they serve to expedite, rather than delay." *Kuvedina, LLC v. Pai*, No. 11-cv-2282, 2013 WL 5097411, at *1

(C.D. Ill. Sep. 12, 2013) (citing *Heller Fin., Inc. v. Midwhey Powder Co., Inc.*, 883 F.2d 1286, 1294 (7th Cir. 1989)).

Under the Federal Rules of Civil Procedure, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). While it is true that, in general, "unsubstantiated, self-serving affidavits may be used to defeat a motion for summary judgment," parties may not "manufacture material fact questions by affidavit testimony that contradicts prior sworn testimony." *U.S. v. Funds in the Amount of $100,120.00*, 730 F.3d 711, 718 (7th Cir. 2013). However, "the term 'selfserving' must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment." *Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013); *see also Rooni v. Biser*, 742 F.3d 737, 740 (7th Cir. 2014) ("One acceptable type of evidence is the plaintiff's own affidavit, as long as it otherwise contains information that would be admissible if he were testifying directly. There is nothing suspect about the fact that such affidavits are normally 'self-serving.'"); *La Playita Cicero, Inc. v. Town of Cicero*, No. 11-CV-1702, 2014 WL 944859, at *2 n.4 (N.D. Ill. Mar. 11, 2014) ("the Court may rely on the affidavit to demonstrate that Plaintiffs contest Defendants' version of the underlying factual allegations that form the basis of the citations and complaints.").

The Court addresses the motion to strike only insofar as it impacts the question of exhaustion of administrative remedies. Dr. Carter seeks to strike Johnson's declaration, which states that he appealed his grievances to the Board, because at his deposition he testified that he could not remember and was not sure whether he appealed his grievances. At the time of his deposition, however, Johnson was *pro se*. As defense counsel noted on the record at the outset of

the deposition, Johnson stated he never received notice of the deposition yet agreed to proceed anyway. From the transcript, Johnson does not appear to have reviewed any documents during his deposition. And, based on Johnson's representation that he was unaware that the deposition was going to occur when it did, the Court finds it unlikely that Johnson had reviewed any materials before the deposition to prepare for it.

Under these circumstances, Johnson's testimony that he was "not sure of" and did "not remember" events surrounding his grievance is not surprising. Nor is the fact that he recalled events more clearly later on. Moreover, the fact that he was able to refresh his recollection when preparing his declaration is not sufficient to cause the Court to strike it. This is not a situation where Johnson has directly contradicted himself or is attempting to manufacture an open question as to his allegations; instead, it appears that he was not adequately prepared for his deposition and consequently could not remember events as well as he did at the time he filed his original complaint over a year prior. The motion to strike Johnson's declaration is therefore denied. In addition, the motion to strike the declaration of Johnson's counsel is denied as moot, as it does not relate to the exhaustion issues and was not considered in connection with the instant ruling.

### III. Exhaustion of Administrative Remedies

The Court must resolve the question of whether Johnson exhausted his administrative remedies prior to considering the merits of his deliberate indifference claims. *See Pavey I*, 544 F.3d at 742. Under the PLRA, prisoners are required to exhaust all administrative remedies before bringing a civil action in federal court based on prisoner conditions. 42 U.S.C. § 1997(e)(a).[2] Prior to filing a complaint in district court, a prisoner "must take all steps prescribed by the

---

[2] The PLRA provides that, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).

prison's grievance system." *Ford v. Johnson*, 362 F.3d 395, 397 (7th Cir. 2001). Defendants may raise the affirmative defense of exhaustion, and they carry the burden of proof for demonstrating failure to exhaust. *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006).

Johnson filed two emergency grievances, both of which were returned to him by the Stateville Warden marked as non-emergencies that needed to be submitted through the regular grievance process. Johnson has stated that he appealed both of those grievances to the Review Board, and attached to his declaration an exhibit wherein the Review Board acknowledged receipt of the appeals and requested additional information. Neither party has presented evidence regarding what happened after the Board sent this receipt letter requesting additional information to Johnson. Thus, from the available record, the Court cannot determine whether or not Johnson submitted the additional information.

Dr. Carter argues that Johnson failed to exhaust his administrative remedies because he did not attempt to resolve his complaint informally through his counselor as required under the administrative rules. *See* 20 ILDC § 504.810(a) ("An offender shall first attempt to resolve incidents, problems, or complaints other than complaints concerning disciplinary proceedings through his or her counselor."). In response, Johnson asserts that, while he did not meet informally with his counselor before filing the first grievance, he did meet with his counselor before filing the second grievance. (PSAF ¶ 11.) Johnson further argues that the requirement to meet informally with a counselor does not apply to emergency grievances, which are more time-sensitive in nature than other grievances.

To the extent Johnson was in fact required to meet with his counselor prior to submitting an emergency grievance, there is at least a disputed issue of fact regarding whether he satisfied that requirement for the second grievance. But based on a plain reading of the relevant regulations Johnson was not required to participate in informal counseling before submitting either of his emergency grievances. The regulation governing emergency proceedings for inmate grievances expressly provides that "[an] offender may request that a grievance be handled on an emergency basis by forwarding the grievance *directly* to the Chief Administrative Officer." 20 ILDC § 504.840 (emphasis added). The emergency procedure stands in contrast to the normal process for filing grievances, which requires the offender first to attempt to resolve the problem informally through his counselor and then to submit the grievance form to the Grievance Officer. *Id.* § 504.810. Only after the Grievance Officer has considered and prepared findings and a recommendation does a non-emergency grievance finally make its way to the Chief Administrative Officer. *Id.* § 504.830. By sending his first grievance directly to the Chief Administrative Officer, Johnson was following the emergency procedure.

It is of no moment whether Johnson was mistaken to believe that his situation qualified as an emergency. Construing the facts in the light most favorable to Johnson, his belief that he was at risk of a permanent and severe injury to his hand, which was causing him a substantial amount of pain, indicates that his use of the emergency grievance process was in good faith. If Johnson had invoked the emergency process for improper reasons, such as to skip ahead of the line for a grievance that clearly did not rise to the level of an emergency, perhaps the answer would be different. In this case, however, it appears that Johnson reasonably believed that there was an emergency.

Dr. Carter contends that Johnson was required to re-submit his grievances through the regular, non-emergency grievance process once the Warden rejected them as emergencies. In support of this argument, he notes that the response from the Warden clearly stated that Johnson was required to re-submit the grievances. What is less clear, however, is whether the Illinois Administrative Code supports this interpretation of the grievance process.

Under 20 ILDC § 504.840, which describes the process for filing an emergency grievance, there is no indication that if an emergency grievance is rejected, a non-emergency grievance must be submitted in its place. Section 504.840 only requires the offender to forward the grievance directly to the Chief Administrative Officer if it is an emergency request; the rest of the section outlines the requirements for the Chief Administrative Officer in responding to the request. *See* 20 ILDC § 540.840(b) ("The Chief Administrative Officer shall expedite processing of the grievance and respond to the offender, indicating what action shall be or has been taken."). Indeed, "[t]here is nothing in the current regulatory text . . . that requires an inmate to file a new grievance after learning only that it will not be considered on an emergency basis." *Dixon v. Schaefer*, No. 11 C 6860, 2013 WL 941971, at *3 (N.D. Ill. Mar. 11, 2013) (quoting *Thornton v. Snyder*, 428 F.3d 690, 694 (7th Cir. 2005)); *see also Glick v. Walker*, 385 Fed. App'x 579, 583 (7th Cir. 2010) (there is "no obligation to resubmit the grievance through normal channels, even if the warden concluded that expedited review was unnecessary"). The Court declines to read such a requirement into the regulation, and therefore does not find a failure to exhaust based on Johnson's failure to re-submit his grievances through the non-emergency grievance process.

Dr. Carter next argues that Johnson failed to exhaust his administrative remedies because he did not appeal his grievances. To support this argument, Dr. Carter points out that during his deposition Johnson could not recall whether he appealed his grievances, stating "I think so" and

"I'm not sure." (Carter SOF Ex. B at 36:21-24.) However, in his declaration, Johnson states that he *did* appeal both grievances and in fact received an acknowledgement of appeal from the Review Board. Johnson even includes as an exhibit to the declaration the Review Board's correspondence dated May 21, 2012, which has checked two boxes under "Additional Information required" – one requesting a copy of the actual grievance and one requesting a copy of the grievance report, including the Chief Administrative Officer's response.[3] (Pl. Resp. Ex. D, Dkt. No. 78.)

While the available record shows that Johnson received an acknowledgement of appeal from the Review Board, it is unclear whether Johnson ever followed through with his appeal after the Review Board requested the additional documentation from him. Johnson states only that the Review Board received his appeal, and does not indicate whether he took any action after receiving the Review Board's letter requesting additional information. The parties' briefs also do not address what, if anything, happened after Johnson received the response from the Review Board.

Furthermore, the Illinois Administrative Code provides that the Director "shall review the findings and recommendations of the Board and make a final determination of the grievance within 6 months after receipt of the appealed grievance, where reasonably feasible under the circumstances" and that the prisoner should be sent a copy of the final decision. 20 ILDC § 504.840(f). Yet neither Johnson nor Defendants make any representations regarding whether a final decision was ever reached by the Director. The appealed grievance here was received by the Review Board on May 21, 2012, making the deadline for a decision November 21, 2012. This case was filed on July 20, 2012. While enough time passed between the Review Board submission

---

[3] The relevant regulation regarding appeals to the Review Board provides that "[c]opies of the Grievance Officer's report and the Chief Administrative Officer's decision should be attached" to the offender's submission. 20 ILDC § 504.850(a).

and Johnson's complaint such that could have been a decision, the record does not reveal whether Johnson received one. Thus, the only conclusion that can be supported by the current record is that there is a genuine issue of material fact regarding whether Johnson exhausted his administrative remedies by filing a proper appeal.

In a final attempt to convince this Court that he has, in fact, exhausted his administrative remedies, Johnson argues that he was not required to appeal under the emergency grievance procedure. This is incorrect. There are sections in the Illinois Administrative Code for both regular grievances (§ 504.830) and emergency grievances (§ 504.840). Immediately following both of those sections is a section regarding appeals (§ 504.850). The appeals section begins by stating:

> If, after receiving the response of the Chief Administrative Officer, the offender still feels that the problem, complaint, or grievance has not been resolved to his or her satisfaction, he or she may appeal in writing to the Director within 30 days after the date of the decision.

20 ILDC § 504.850(a). The emergency grievance procedure only excuses an inmate's obligation to submit his grievance to the grievance officer before submitting it to the Chief Administrative Officer; nothing in the procedure relieves the inmate of his obligation to appeal the Chief Administrative Officer's decision. None of the cases cited by Johnson hold to the contrary. *See, e.g., Glick v. Walker*, 385 Fed. App'x 579, 581 (7th Cir. 2010) (finding that the offender did appeal the decision to the Review Board); *Muhammad v. McAdory*, 214 Fed. App'x 610, 611 (7th Cir. 2007) (finding that the offender did file an emergency grievance with the Warden, his grievance officer, and the Review Board).

The Seventh Circuit has instructed that when exhaustion is contested the district court should conduct an evidentiary hearing on the issue:

15

> The sequence to be followed in a case in which exhaustion is contested is therefore as follows: (1) The district judge conducts a hearing on exhaustion and permits whatever discovery relating to exhaustion he deems appropriate. (2) If the judge determines that the prisoner did not exhaust his administrative remedies, the judge will then determine whether (a) the plaintiff has failed to exhaust his administrative remedies, and so he must go back and exhaust; (b) or, although he has no unexhausted administrative remedies, the failure to exhaust was innocent (as where prison officials prevent a prisoner from exhausting his remedies), and so he must be given another chance to exhaust (provided that there exist remedies that he will be permitted by the prison authorities to exhaust, so that he's not just being given a runaround); or (c) the failure to exhaust was the prisoner's fault, in which event the case is over. (3) If and when the judge determines that the prisoner has properly exhausted his administrative remedies, the case will proceed to pretrial discovery, and if necessary a trial, on the merits; and if there is a jury trial, the jury will make all necessary findings of fact without being bound by (or even informed of) any of the findings made by the district judge in determining that the prisoner had exhausted his administrative remedies.

*Pavey I*, 544 F.3d at 742; *see also Begolli v. Home Depot USA, Inc.*, 701 F.3d 1158, 1160 (7th Cir. 2012) ("*Pavey* holds that the judge can resolve contested factual issues germane to whether the prisoner had exhausted his remedies under the Act even if the prisoner demanded a jury trial in his civil rights suit."); *Pavey v. Conley*, 663 F.3d 899, 904 (7th Cir. 2011) ("Pavey II") (finding that the district judge can make a decision to credit the testimony of one witness over another in the context of a *Pavey* hearing so long as the decision is not "completely without foundation"). The Court further reminds Johnson that at the *Pavey* hearing he will not be permitted to argue that because exhaustion is an affirmative defense, he is not obliged to provide evidence that he meets an exception to the exhaustion requirement, such as failure to act by the Review Board. *See Moore v. Feinerman*, 515 Fed. App'x 596, 599 (7th Cir. 2013) ("Although a defendant generally bears the burden of proving an affirmative defense, like exhaustion, a plaintiff typically bears the burden of establishing an exception to it . . . .").

As the Court is unable to consider the merits of Johnson's claims without first determining whether he has properly exhausted his administrative remedies, Defendants' motions for summary

judgment are denied without prejudice to permit the parties an opportunity for limited discovery and a *Pavey* hearing.

## CONCLUSION

For the reasons stated above, Defendants' motions for summary judgment (Dkt. Nos. 50, 54) are denied without prejudice. Defendants' motion to strike (Dkt. No. 83) is denied with respect to Johnson's declaration and denied as moot with respect to the declaration of Johnson's counsel. To resolve the question of whether Plaintiff has exhausted his administrative remedies, the Court will hold a *Pavey* hearing. At the next status hearing, the parties should be prepared to discuss a schedule for the hearing, including the completion of any additional discovery necessary to prepare for it.

Dated: October 3, 2014

Entered:

_____

Andrea R. Wood
United States District Judge